MILLER, Judge pro tem.
Yvonne Brown, an emancipated minor, brought this suit seeking damages for personal injuries and medical expenses resulting from a fall which occurred while she was leaving the Baton Rouge Bus Company’s bus while it was stopped at its downtown terminal. The alleged reason for the admitted fall was the claim that the floor and steps of the bus had become muddy and slippery due to passengers entering and leaving the bus with dirty feet on the rainy day of September 8, 1959, the date on which the accident occurred. The only question involved is whether or not defendant had allowed the bus floor and steps to’become hazardous for passenger use and thereby breached any legal duty to plaintiff in her capacity as a paying passenger on a public carrier.
This suit was filed on September 8, 1960, tried and decided on February 16, 1961, and on March 17, 1961, after plaintiff’s motion for a new trial had been argued and overruled, judgment was signed rejecting plaintiff’s demands. From such judgment, plaintiff has taken the present devolutive appeal. The distinguished trial judge furnished extensive reasons for his findings, and both counsel for appellant and appellee have filed excellent briefs on both the facts and the law.
Plaintiff’s counsel specifies three errors as the basis for this appeal and sets them forth as:
“1. The Trial Court erred in finding that the injuries sustained by the plaintiff were not due to lack of safety precautions or negligence on part of the defendant or its employee, when the evidence in the record does not support such finding.
“2. The Trial Court erred in finding that the injuries sustained by the plaintiff must have been due to her lack of precaution for her own safety, when the record lacks and is void of any evidence showing a negligent act of plaintiff as the proximate cause of the accident.
“3. The Trial Court erred in holding that it was the burden of the plaintiff to prove her cause and/or case, and in failing to hold that the burden of proof is placed upon the carrier to prove itself free from fault, when the accident appears to have occurred without fault on part of the passenger, and the passenger makes out a prima facie case by showing that he was a passenger at the time of receiving the injury, that an accident occurred, and that his injury resulted therefrom.”
In summarizing these specifications of error, counsel for the plaintiff states that “This case presents one basic issue which is whether or not the evidence in the record sustains a finding that the defendant committed acts of negligence, or acts of omission of prudence proximately causing the accident wherein plaintiff was injured.”
Only four witnesses testified with regard to the accident itself, the plaintiff offering her own testimony and that of her friend, Katie Grant Carter; defendant calling the *660 bus operator Tommy B. Wilson, Jr. and Lester Desmoulin, who was one of the intending passengers waiting for the bus on the sidewalk outside the bus at the time the accident occurred. Plaintiff’s other two witnesses were the treating physician and a professional photographer. Defendant’s other witness was its assistant manager, P. E. Jennings, who testified concerning his inspection of the bus, and gave some expert testimony concerning the floor and step covering of the bus.
Since counsel are in substantial agreement as to the law applicable to this case, it is necessary that we review the testimony of the witnesses to find whether or not the trial judge committed manifest error in arriving at his finding that the Bus Company was free from negligence in this case.
Yvonne Brown testified that she was eighteen years old at the time of the trial and was seventeen years old at the time of the accident. She was six months pregnant — '“showing”—but was otherwise in good health at the time of the accident. On September 8, 1959, she and Katie Grant Carter walked down 48th Street to catch the bus, walking on the dirt side of the street and not on the blacktop. It was drizzling rain at the time. When they got on the bus, the driver was not on it, as he was in a store at the corner and therefore they did not pay their fare as they got on. The driver returned in about two minutes, and the bus proceeded on its regular route to the downtown terminal. She related that the driver started the bus as soon as he got on it and she was afraid to get up and walk in the bus to pay her fare while it was moving, so she had to pay her fare as she left the bus downtown. The bus stopped so that passengers could step off on the sidewalk, and after the bus came to a complete stop she got up to leave. She walked to the operator at the front of the bus with a quarter and a nickel and gave the quarter to the operator in order to obtain change to pay 30 cents for the two fares for herself and her friend. On get-ing change from the operator, she held on to the post or handhold rod right back of the driver’s seat with her left hand. Getting her change in her right hand, she transferred the money to her left hand to put it in the fare box, caught the right hand handrail with her right hand in order to go out, and while so turning and reaching for the coin box with her left hand and starting toward the steps, she slipped and fell. It was the plaintiff’s contention in her testimony that she fell before she ever got to the steps. But reading her entire testimony we conclude that she came to rest after the fall in a sitting position seated on either the lowest or middle of three steps and with her feet on the sidewalk outside of the door of the bus. She related that she did not know who, if anybody, had helped her up, and that she was embarrassed and wanted to get away from there. The bus operator asked her if she was hurt, and she stated that she was not hurt and had no pains and so told the operator. She related that she had on a beige skirt and that, after getting up, she noticed that there was mud and water on the back of the skirt, and for the first time looked at the steps and noticed, for the first time, that the steps were muddy and slimy. Although she testified that she had fallen before she got to the steps, she denied that she looked at the floor where she had slipped, and stated that she saw the mud and water, etc., on the steps. Plaintiff further testified that after she told the driver she wasn’t hurt, he started taking names. He got her name and address and then took Katie’s name and address. She then went in Sears Roebttck Store located adjacent to the bus stop and called her employer and told her she would not be at work since she had had an accident. During extensive cross-examination, plaintiff admitted that she did not direct anyone’s attention to any muddy or slippery condition at the time of or immediately after the accident. She related that she hadn’t noticed anything unusual when she boarded the bus, had not noted the condition of the bus during the trip down *661 town, or in fact until after she fell; that she did not know if her shoes were muddy when she got on the bus, but thought that her shoes were not muddy. Although she ■did not know, she supposed that other people had got on and off the bus between the time she boarded and the time the bus got downtown, since the bus made stops. Attempting to particularly describe what she saw after she first noticed something on the back of her dress, it is important to note that plaintiff testified that the “mud” ■she saw on the step was from people tracking mud up on the bus, like people walking off a dirt sidewalk would bring on the bus — -like if you walk on dirt out by 48th Street if it rains, a little trash getting up under shoes — and more particularly described it as being just grit and dirt and ■stuff like anybody will track in when getting into a bus or coming into a house off the street. It is also important to note that plaintiff testified that she did not look at the floor, where she claimed that she slipped, but rather she looked at the steps, where she did not slip, but where she fell.
Katie Grant Carter identified herself as a very close friend and neighbor of the plaintiff for quite a while. In general, her testimony was similar to that of the plaintiff. She related that after the bus came to a complete stop at the downtown terminal, she and the plaintiff started off the bus by the front door, with Yvonne in front with both fares. This witness related that, as plaintiff attempted to get off the bus, her feet slipped from under her, causing her to fall on the steps as she was leaving. Contrary to plaintiff’s testimony that she had never reached the steps and was turning away from the bus operator at the time she fell, this witness, who was standing or walking approximately one foot behind the plaintiff, was quite sure that the plaintiff had actually started down the steps, and was moving one of her feet to step on the steps at the time that the slip occurred. Katie was of the opinion that Yvonne had made a step down, and that she had slipped •on the steps. Like the plaintiff, Katie Carter related that she did not notice anything unusual about the bus when they got on, nor had anything unusual been noticed during the trip to town, saying that she had paid no attention to the steps of the bus until after the plaintiff had fallen. This witness’s description of what she saw was somewhat similar to plaintiff’s testimony in that regard. She noticed some water on the steps and some mud or something from people entering the bus and wiping their feet on the steps. She testified that the floor in the area around the coin box had a little water on it. Although she related that she saw mud and water, when questioned in detail, she related that she didn’t see anything on the floor or the steps other than the usual dirt, like is on a floor, plus wetness. There were no hunks of mud, and she agreed that it was like floor dirt that had water on it, and further explained that she didn’t know that there was any more dirt and stuff on the floor on this particular date than there always was on buses where people walk in and out. Questioned still further, she related that she just saw some dirt that was wet, and did not see any pile of mud or any accumulation of mud. The witness related that her own feet had not slipped when she got on or off the bus, and that she did not know that what she saw was slippery. She hadn’t slipped, she didn’t see anyone else slip, and she did not test it with her foot to see if it was slippery, she just looked at it. Although Katie Carter testified that she did not know what made the plaintiff slip, she thought that the condition which she had described might have been the cause of the fall.
Defendant’s principal witness was the bus operator, Tommy B. Wilson, Jr. Wilson described himself as a bus operator for the defendant for the last eight and a half years, and the operator in charge of the bus when plaintiff fell. He testified that this bus was completely cleaned just before he took it from the defendant’s garage at about noon and that the plaintiff fell at approximately 2:10 p. m. after Wilson had almost completed his second run of his *662 route. It is clear that the route traversed by Wilson on September 8, 1959, was through several sections of the city that did not have sidewalks. He related that he did not see the plaintiff get on the bus, as he had gone into a store in order to get a Coca Cola, and left the bus door open. Though he walked away from the bus with his back turned, he watched his bus while drinking the Coca Cola, and was gone from his bus a period of from 'three to five minutes. Though he had no independent recollection of the plaintiff and Katie Carter boarding the bus, he did recall the incident at the loading zone at Sears on North Boulevard at Third Street, which place is one of the terminals for the route. Wilson related that the plaintiff started down the steps. He did not know if she had slipped or if her heel caught, but on the second step she had started falling. The witness described the steps and floor of the bus by relating that there were two steps, plus the floor level of the bus, making three different levels that must be traversed in getting on or off the bus. Wilson testified that he was watching the plaintiff as she was leaving the bus, and was about four feet from her when she started falling. After she fell, he helped her up and asked her if she was hurt. She replied that she was not. He then started collecting names for his report. He related that he looked at the floor and the steps both before and after the plaintiff got up, and though the steps were wet there wasn’t any mud. According to this witness, there was no mud on the floor or the steps anywhere, and no accumulation of water. The wet floor and steps were made that way by passengers boarding from the wet sidewalks and streets on the rainy day. He further testified that the only thing present was the grit that comes off shoes when people come in and out of the bus. Wilson testified that at the time of the plaintiff’s fall there was nothing different about the condition of the floor as compared with earlier in the day, and that though other people had gotten in and out of the bus at the same time, nobody else slipped or fell or had any difficulty. During his operation of the bus on the day in question, no one else slipped or had any difficulty getting on or off. After getting the names of witnesses, he testified that he went on his regular runs throughout the day without any further incident. Particularly important was Wilson’s testimony with regard to the kind of material with which the steps and floor are covered. He identified a piece of material that was offered in evidence and described it as a piece of rubber cord especially designed for buses and trains, and that it was the kind of material with which the steps and floor of his bus were covered on the day of the accident. He related that he was thoroughly familiar with the material, that he had occasion to walk on it every day, and that it was not slippery when wet and was not slippery at the time the plaintiff had her fall.
Defendant’s witness, Lester Desmoulin, related that he was with a group of people waiting in front of Sears Roebuck at the downtown terminal for the bus when it drove up; that the bus came to a complete stop, and while he was standing there with about two people in front of him, the bus door opened, and he saw a lady fall down coming down the steps and fall on her back. He explained that he did not see her start to fall, but that she was falling when he first saw her, and that at that time she was in the act of coming down the steps. After falling with her feet outside the door, she was helped up by someone in back of her, and he did not see where the plaintiff went after she was helped up. This witness gave his name and address to the bus operator and got on the bus himself. He did not hear anyone say anything about mud or anything slippery at the time. So far as his own observations were concerned, this witness related that he didn’t pay any particular attention himself and didn’t look at the steps or the floor. However, he had no trouble getting on or off the bus himself. Other people got on at the same place he did, and he saw people get off the bus before he got off the bus follow *663 ing its departure from the terminal, and he never saw anybody have any difficulty standing or walking or going down the steps.
Defendant’s other witness, Mr. Pinkey E. Jennings, assistant manager of the bus company, was in charge of claims and safety work for the defendant. He confirmed Wilson’s description of the material with which the floor and steps of the bus are covered, and gave its trade name as Rub-bub. He described it as a mixture of fabric and rubber, and as being a nonskid, nonslip material. Mr. Jennings related that this Rubbub material had been demonstrated to him, and from his knowledge and experience from having driven a bus himself for many years, he was positive that it was nonskid, and that when wet it did not slip. He likewise described the construction of the material as being composed of grooves and ridges so that, according to his experience and the demonstrations he had seen, dirt or mud on the shoes of passengers would work off into the grooves and the nonskid ridges would keep their nonskid qualities. He likewise related that water would do the same thing; that is, collect in the grooves, and would not tend to collect or pool, and that water or wetness did not make the Rubbub slippery.
In reviewing the record we find that we are in complete accord with the finding of the trial judge that the defendant was free from any fault. We find as a fact that the floor of the bus was not slippery at the time that the plaintiff fell. The fact that it might have been possible for rain to come in the open door during the three to five minutes that Wilson was out to get a Coca Cola is irrelevant, for there is not any evidence that suggests that there was more water or, as we view the record, dampness, on the steps and floor of the bus than would ordinarily be brought in by passengers during the course of a run on a rainy day. The same observation applies to the evidence concerning the “mud” as claimed by the plaintiff’s witnesses, but which we conclude was only the usual grit or grime. The only suggestion that the covering on the steps and floor of the bus was slippery comes about by virtue of the fact that plaintiff fell. To hold that this evidence alone would entitle plaintiff to recover under the facts proved in this record, would make the defendant an insurer of the safety of its paying passengers.
As was held in the case of Bishop v. Shreveport Rys. Co., La.App., 63 So.2d 181, 183:
“A long line of authority has iterated and emphasized the pronouncements that a public carrier is required to show absolute freedom from negligence, the slightest showing of negligence being sufficient to establish primary liability, but concededly the burden of such a defendant does not extend to the necessity of establishing the cause of an accident nor is such a carrier to be considered an insurer of the safety of its paying passengers.”
And again in the case of Green v. Baton Rouge Bus Company, La.App., 66 So.2d 344, 347-348:
“Our jurisprudence, while it holds a public carrier to the exercise of the* highest degree of care, does not make it an absolute insurer of the safety of its passengers. Consequently, while the burden of proof is upon the carrier to show itself free from fault, the carrier’s liability is based upon negligence, and if it appears that there was no negligence whatsoever upon the part of the carrier, there is no liability.”
Counsel for the plaintiff-appellant cites from the case of Alexander v. Continental Southern Lines, Inc., La.App., 130 So.2d 539, 540-541, the following quotation:
“The law is well settled that a carrier of passengers must exercise a degree of care, skill and diligence for the safety of its passengers, as is required by the nature and risk of the under *664 taking in view of the mode of conveyance and other circumstances involved. Under this rule the carrier is held to the highest degree of care, skill and diligence, the highest practical care, or extraordinary care and caution. 13 C.J.S. Carriers § 678, p. 1255. Johnson v. Continental Southern Lines, Inc., La.App., 2 Cir.1959, 113 So.2d 114, 74 A.L.R.2d 1328.”
However, in the Alexander case, supra, as in this case, the trial judge observed: “It it not clear just what caused the plaintiff to suffer this fall.” And as the Court of Appeal, Second Circuit, concluded in the Alexander case, “We are of the opinion that defendant has exculpated itself from all of the charges of negligence made against it. It is not an insurer of its passengers.”
For these reasons, the judgment of the trial court is affirmed and plaintiff’s demands are rejected at her costs.
Affirmed.